## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **STEVEN JEFFERIES** | **: CIVIL ACTION** |
| | : |
| **vs.** | **: NO. 17-2346** |
| | : |
| **JEFFERSON B. SESSIONS, III,** *et al* | : |

## MEMORANDUM

**KEARNEY, J.**                                                                    **October 3, 2017**

In legislation enacted in 1968, Congress prohibited persons involuntarily committed for mental illness from possessing a firearm. No one disputes the valid government purpose in ensuring an involuntarily committed person suffering with mental illness cannot possess a firearm. The tougher question arises in the permanency of this prohibition. Congress allows Pennsylvania officials or the Attorney General to grant relief from its statutory prohibition but Pennsylvania has not established a compliant program and Congress has barred funding the Attorney General's ability to administer this process. After evaluating the statute's purpose relating to once involuntarily committed persons, we follow the analytic framework set a year ago by our court of appeals in *Binderup* and conclude Congress can constitutionally prohibit a person once involuntarily committed from ever possessing a firearm. This is particularly so when Congress provides avenues for relief, albeit not presently available. We are not asked to today to opine on potential claims against Congress for not funding the Attorney General's waiver program or against Pennsylvania for non-compliance with the federal mandate. In the accompanying Order, we grant the Attorney General's Motion to dismiss the once-involuntarily committed person's claim Congress's prohibition is unconstitutional as-applied or deprives him of due process or equal protection under the Fifth or Fourteenth Amendments.

## I.    Allegations

Steven Jefferies alleges the United States violates his Second Amendment rights by prohibiting him from possessing a firearm based on his involuntary commitment under 18 U.S.C. § 922(g)(4). He alleges the United States' failure to provide "a reasonable procedure pursuant to which an individual could regain their Second Amendment rights upon demonstrating their current mental and emotional fitness" makes the prohibition overbroad and as-applied to him impermissibly burdens his Second Amendment rights. He alleges the United States also violates his Fifth Amendment right to due process by depriving him of his right to keep and bear arms without pre-deprivation notice and an opportunity to be heard or a post-deprivation proceeding for relief from the prohibition. He lastly alleges an equal protection violation under the Fourteenth Amendment but does not identify similarly situated parties.

We find, as a matter of law, his arguments lack merit under our court of appeals' 2016 holding directing us to not consider the person's rehabilitation since the incident causing the prohibition.

### A.    The involuntary commitment of Mr. Jefferies.

Fifty-two year old Steven Jefferies lives in Montgomery County where he is self-employed as a landscaper.[1] He attended technical automotive repairs school while at Plymouth Whitemarsh High School and graduated in 1984.[2] He then worked as a mechanic for 25 years.[3] Mr. Jefferies learned how to safely handle and shoot firearms from his father and at 12 years old, he took hunter safety classes.[4] He avidly hunted deer with rifles and bow until he could no longer possess firearms.[5]

On October 5, 2001, Mr. Jefferies had an altercation with his former wife because he "believed, rightly or wrongly, [she] was having an affair."[6] His former wife alleged Mr. Jefferies

2

"threatened or attempted suicide" and "threatened to kill himself."[7] Based on Mr. Jefferies's suicidal threats, his former wife petitioned to have the Montgomery County Court of Common Pleas involuntarily commit him under § 302 of Pennsylvania's Mental Health Procedures Act.[8] She swore Mr. Jefferies followed her and their 8 year old daughter to a local football game but she was unaware he followed her until they were leaving the game.[9] Mr. Jefferies followed his wife and daughter home and "proceded [sic] to bump the back of [her] car as [she] was turning onto [their] street. An argument followed. [Mr. Jefferies] told [his wife] that he had been practicing how to…"[10]

The state court involuntarily committed Mr. Jefferies on October 5, 2001 for a period not to exceed 72 hours. On October 9, 2001, Mr. Jefferies's treating doctors petitioned to continue his involuntary commitment for up to 20 more days of outpatient treatment.[11] The court agreed and found Mr. Jefferies "several mentally disabled and in need of treatment" and discharged him for up to 20 days of outpatient treatment under § 303 of the Mental Health Procedures Act.[12] Mr. Jefferies alleges the doctors' concern he would harm himself is the "primary reason" for his commitment and his "experience at this mental health facility was horrendous to say the least."[13] Since leaving involuntary commitment in October 2001, Mr. Jefferies has not received mental health treatment.[14]

## B.    Mr. Jefferies attempts to restore his Second Amendment rights.

As a result of his involuntary commitment, both Pennsylvania and federal law prohibited Mr. Jefferies from possessing a firearm. A few years after release from his involuntary commitment, Mr. Jefferies petitioned the Montgomery County Court of Common Pleas to restore his ability to possess firearms.[15] The state court granted his petition on January 16, 2004 determining Mr. Jefferies "capable of possessing firearms without posing a danger to himself or

3

others."[16]

Mr. Jefferies began using his firearms.[17] When he tried to purchase a new firearm, he failed the Pennsylvania Instant Check System.[18] Mr. Jefferies attempted to renew his license to carry concealed firearms.[19] He learned he could not renew his license because federal law prohibited individuals previously subject to involuntary commitment from acquiring firearms.[20]

Mr. Jefferies now sues Attorney General Jefferson Sessions, the Department of Justice and a variety of federal officers and agents along with the United States (together "United States"). Mr. Jefferies asks us to declare 18 U.S.C. § 922(g)(4) and its attendant regulations violate his Fifth and Fourteenth Amendment right to equal protection and due process and to permanently enjoin the United States from enforcing § 922(g)(4) against Mr. Jefferies.

## II.  Analysis

The Second Amendment effective December 15, 1791 ensures the Government shall not infringe "the right of the people to keep and bear Arms." Our issue is whether the specific language of §922 (g)(4) enacted in 1968 infringes Mr. Jefferies's Second Amendment right: "It shall be unlawful for any person… who has been adjudicated as a mental defective or who has been committed to a mental institution…to…possess… any firearm or ammunition…"

The United States moves to dismiss, arguing § 922(g)(4) passes constitutional muster under the Second Amendment because it is substantially related to the furtherance of an important governmental interest of keeping firearms away from mentally ill persons.[21] The United States argues even if we allow Mr. Jefferies to proceed on an as-applied challenge, § 922(g)(4) as-applied to Mr. Jefferies is constitutional because he caused his involuntary commitment by following his wife and daughter, hitting their occupied car to provoke an altercation, and threatening to commit suicide. The United States also moves to dismiss Mr.

4

Jefferies's due process claims because there is no constitutionally required process to disqualify individuals who have been involuntarily committed from owning firearms.

## A. Mr. Jefferies cannot state a Second Amendment claim.

Mr. Jefferies argues § 922(g)(4) is unconstitutional as-applied to him because as a "competent individual[] who present[s] no risk of harm to [himself] or others", the statute is an undue burden on his Second Amendment right to keep and bear arms.[22] He further argues Congress's bar on funding of the relief afforded by 18 U.S.C. § 925(c) impermissibly infringes upon his Second Amendment right. We find neither argument persuasive.

### 1. Our analysis begins with Second Amendment precedent since 2008.

The Second Amendment prohibits the infringement of "the right of the people to keep and bear Arms."[23] Since the Supreme Court's 2008 landmark *District of Columbia v. Heller* opinion, appellate and trial judges have wrestled with the extent to which Congress's prohibition of firearms possessed by certain persons infringes Second Amendment rights.

#### *Heller*

In *Heller*, the Supreme Court held a "ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense."[24] The Court held "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights" the District of Columbia's handgun ban "would fail constitutional muster."[25] Without deciding the standard of scrutiny applies, the Court noted if rational-basis scrutiny is applied, "the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."[26]

Neither the Supreme Court nor our court of appeals has addressed whether prohibiting a

previously involuntarily committed individuals from possessing a firearm violates the Second Amendment. But key to our factual analysis, the Supreme Court in *Heller* cautioned "nothing in our opinion should be taken to cast doubt on longstanding prohibitions of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."[27]

### *Marzzarella*

The Supreme Court in *Heller* did not decide the standard of scrutiny applying to Second Amendment rights because it held the District of Columbia's handgun ban failed under all standards of scrutiny.[28] Since then, trial courts are continually evaluating the proper standard of scrutiny for these Second Amendment challenges. For example, shortly after *Heller*, Michael Marzzarella claimed 18 U.S.C. § 922(k) prohibiting the possession of a firearm with the serial number obliterated unconstitutionally infringes on his Second Amendment rights.[29] Our court of appeals interpreted *Heller* to "suggest a two-pronged approach to Second Amendment challenges."[30] We determine whether the law burdens "conduct falling within the scope of the Second Amendment's guarantee."[31] If the conduct falls outside the scope, we are finished with our inquiry. If the conduct is within the Second Amendment's scope, "we evaluate the law under some form of means-end scrutiny" to determine if the law passes constitutional muster.[32] The court of appeals found uncertainty as to whether possession of "unmarked firearms" is outside the scope of the Second Amendment's guarantee so it proceeded to evaluate if § 922(k) passed constitutional muster.[33]

Our court of appeals in *Marzzarella* held the Supreme Court's footnote recognizing Justice Breyer's dissent "correctly notes [the handgun ban] ... would pass rational-basis

6

scrutiny" suggests a heightened standard of scrutiny applies.[34] Our court of appeals found intermediate scrutiny is the appropriate standard of review because unlike the handgun ban in *Heller* which prohibited possession of handguns, § 922(k) only regulates the possession of firearms with their serial number obliterated.[35]

The court of appeals in *Marzzarella* held § 922(k) passed intermediate scrutiny because it served a significant government interest in tracing firearms by serial number and does not burden Second Amendment rights because the court could not "conceive of a lawful purpose for which a person would prefer an unmarked firearms, the burden will almost always fall only on those intending to engage in illicit behavior."[36] The court also concluded, "even if strict scrutiny were to apply … the statute still would pass muster."[37]

### *Barton*

A year later, convicted felon James Barton challenged 18 U.S.C.§ 922(g)(1)'s prohibition on felons possessing a firearm as an "as-applied" unconstitutional infringement on his Second Amendment right.[38] Our court of appeals explained to make an as-applied challenge, Mr. Barton must adduce evidence to distinguish himself and his background from "those of persons historically barred from Second Amendment protections."[39] Our court of appeals held Mr. Barton did not adduce evidence to distinguish himself because his underlying offenses of "drug trafficking and receiving stolen weapons are closely related to violent crime" and there is no evidence Mr. Barton rehabilitated himself because he recently sold a firearm with an obliterated serial number.[40] The court theorizes "a felon convicted of a minor, non-violent crime might show that he is no more dangerous than a typical law-abiding citizen. Similarly, a court might find that a felon whose crime of conviction is decades-old poses no continuing threat to society."[41]

7

## *Binderup*

Our court of appeals' willingness to look beyond the felony to current and rehabilitative conduct lasted approximately five years. In 2016, our court of appeals sitting *en banc*, in *Binderup v. Attorney General United States of America* faced Daniel Binderup's and Julio Suarez's as-applied challenge to the prohibition based on misdemeanors punishable by imprisonment of more than two years.[42] While the majority of our court of appeals allowed an as-applied challenge based on the non-serious nature of the misdemeanors, it focused on the conduct causing the prohibition and not the passage or rehabilitative conduct after the misdemeanors. More significant today, the court of appeals overruled portions of *Barton* and defined our framework for handling as-applied challenges to federal laws prohibiting firearm possession.

Section 922(g)(1) prohibits individuals convicted of a "crime punishable by imprisonment for a term exceeding one year" from possessing firearms.[43] Congress excluded from this prohibition, "any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less."[44] The state court convicted Messrs. Binderup and Suarez of state law misdemeanors punishable by a term of imprisonment more than two years.[45] Pennsylvania and the United States prohibited them from possessing firearms based on their convictions.[46] In 2009, similar to Mr. Jefferies, Pennsylvania granted Messrs. Binderup and Suarez relief from its state law prohibition on possessing firearms, however, § 922(g)(1) still prohibited firearm possession.[47] Messrs. Binderup and Suarez sued the Attorney General asking the court declare § 922(g)(1) does not apply to their convictions as a matter of statutory construction.[48] If § 922(g)(1) does apply to their convictions, they asked the court to declare it unconstitutional as-applied to them.[49]

8

Our court of appeals in *Binderup* first rejected the statutory construction argument holding when Congress made an exception for state law misdemeanors "punishable by a term of imprisonment of two years of less" the use of "punishable by" means "subject to a maximum penalty of."[50] Our court of appeals unanimously held § 922(g)(1) applies to their convictions because the state court convicted both Messrs. Binderup and Suarez of misdemeanors subject to a maximum penalty of five years.[51]

Our court of appeals then turned to the constitutionality of § 922(g)(1). The court first rejected the argument the Supreme Court's holding in *Heller* means "any law barring persons with Second Amendment rights from possessing law firearms in the home even for self-defense is *per se* unconstitutional; that is, no scrutiny is needed."[52] The court likened the government's ability to burden Second Amendment rights to its ability to "prevent an individual with First Amendment rights from engaging in First Amendment conduct—even conduct at the core of the First Amendment—if it makes the showing necessary to surmount heightened scrutiny."[53]

Our court of appeals found § 922(g)(1) did not "completely eviscerate" Second Amendment rights because individuals had avenues of relief from it. Individuals could regain their rights under 18 U.S.C. § 921(a)(20) if the state expunges their convictions, the state pardons them, or the state restores their civil rights. The court of appeals also cited an avenue for statutory relief where an individual could request the Attorney General lift § 922 prohibitions.[54]

Our court of appeals then turned to the Messrs. Binderup and Suarez's as-applied Second Amendment challenge and its framework to review those challenges. Reviewing *Marzzarella* and *Barton*, the court defined "a framework for deciding as-applied challenges to gun regulations."

As directed by our court of appeals in *Binderup,* we evaluate *Marzzarella*'s two-prong

9

approach by first determining "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee, and, second, if the "law burdens protected conduct, the proper course is to 'evaluate the law under some form of means-end scrutiny.'"[55]

Our court of appeals identified "two hurdles" a challenger must surmount to make an as-applied challenge.[56] First, the challenger must "identify the traditional justifications for excluding from Second Amendment protection from the class of which he appears to be a member, and then ... present facts about himself and his background that distinguish his circumstances from those persons in the historically barred class."[57]

The court of appeals in *Binderup* then closely examined Messrs. Binderup's and Suarez's disqualifying convictions. Our court of appeals held they proved their crimes were not serious by showing: (1) they are labeled misdemeanors; (2) they lacked a violent element; (3) they received a "minor sentence"; and, (4) there is "no cross-jurisdictional consensus" about the seriousness of their crimes.[58]

Because *Binderup* is a plurality opinion, our court of appeals offered us guidance to understand the "fractured decision."[59] First, "the two-step *Marzzarella* framework controls **all** Second Amendment challenges, including challenges to § 922(g)(1)."[60] To satisfy *Marzzarella*'s first step, a challenger must prove "the law or regulation at issue burdens conduct protected conduct protected by the Second Amendment." [61] To overcome the second hurdle to a § 922(g)(1) challenge, the challenger must prove he or she "was not previously convicted of a serious crime."[62] "Evidence of the challenger's rehabilitation or his likelihood of recidivism" is not relevant to our analysis.[63] If the challenger satisfies both hurdles of *Marzzarella*'s first step, "the burden shifts to the Government at step two to prove that the regulation at issue survives

10

intermediate scrutiny."[64]

## 2. Mr. Jefferies does not plead an as-applied constitutional challenge.

As we now turn to Mr. Jefferies's as-applied challenge to a federal prohibition on firearm possession by a person involuntarily committed, we restate the framework:

### i. *Marzzarella*'s first step.

The United States prohibits Mr. Jefferies from possessing a firearm under 18 U.S.C. § 922(g)(4) based on his 2001 involuntary commitment. Mr. Jefferies argues the statutory ban of firearm possession under § 922(g)(4) as-applied unconstitutionally infringes his Second Amendment right to keep and bear arms in defense of hearth and home.

### a. *Barton*'s first hurdle.

We must determine if § 922(g)(4) prohibiting individuals who were involuntarily committed from possessing a firearm burdens conduct protected by the Second Amendment. When declaring the Second Amendment protects the "right of law-abiding, responsible citizens to arms defense of home and hearth", the Supreme Court cautioned its holding "should not be taken to cast doubt on longstanding prohibitions on the possession of firearms by ... the mentally ill."[65] The court's footnote describes these prohibitions as "presumptively lawful."[66] Our court of appeals held the "presumptively lawful" prohibition of firearms by the mentally ill comport[s] with the Second Amendment because [it] affect[s] individuals or conduct unprotected by the right to keep and bear arms."[67]

We turn to whether Mr. Jefferies's prohibition is presumptively lawful under the Second Amendment. Congress, through § 922(g)(4), prohibits an individual "who has been adjudicated as a mental defective or who has been committed to a mental institution" from possessing a firearm.[68] The Code of Federal Regulations defines "adjudicated as a mental defective" to

11

include, among other things, "[a] determination by a court, board, commission, or other lawful authority that a person, as a result of ... mental illness ... [i]s a danger to himself or to others..."[69] The Code defines "committed to a mental institution" as a "[f]ormal commitment of a person to a mental institution by a court, board, commission, or other lawful authority" including "commitment to mental institution involuntarily" and "commitment for mental defectiveness or mental illness"[70] Section 922(g)(4) is "presumptively lawful" under the Second Amendment and *Heller* because it prohibits the mentally ill from possessing firearms.[71] Mr. Jefferies having been involuntarily committed and found to be a danger to himself is subject to "presumptively lawful" prohibition because it applies to "individuals or conduct unprotected by" the Second Amendment.[72]

We examine the traditional justifications for denying the mentally ill the right to keep and bear arms. While the Supreme Court referred to prohibitions on the mentally ill possessing firearms as "longstanding", courts and scholarly articles examining the history of the prohibition find little evidentiary support before the early twentieth century, and the first federal ban did not occur until 1968.[73]

While our court of appeals has not yet examined the absence of traditional justifications for prohibiting the mentally ill from possessing firearms, other colleagues on the district court have done so. In *Simpson v. Sessions*, Judge Schmehl examined the lack of specific prohibitions on the mentally ill possessing firearms but found "clear historical evidence that persons prone to violent behavior are outside the scope of Second Amendment protection."[74] In *Keyes v. Lynch*, Judge John Jones examined Professor Larson's hypothesis the absence of firearm prohibitions directed at the mentally ill is because eighteenth century "judicial officers were authorized to "'lock up' 'lunatics" who were 'dangerous to be permitted to go abroad'" and if taking away a

lunatic's liberty was permissible, then we should find the "lesser intrusion" of taking his or her firearms was also permissible.[75]  Both courts concluded the strongest historical argument supporting the prohibition "involved a concern over individuals who had mental impairments that made them dangerous to themselves or others in society."[76]

We agree with Judge Schmehl's and Judge Jones's conclusions.  The understanding and language of mental illness is amorphous and ever evolving but § 922(g)(4) prohibits individuals from possessing firearms who, because of their mental illness, are a danger to themselves or others.  The Code of Federal Regulations supports our conclusion defining "mental defective" to include individuals who are "a danger to [themselves] or to others", who are unable to manage their own affairs, or those found insane or incompetent to stand trial in a criminal proceeding.[77] The definition of "committed to a mental institution" also supports our conclusion because it includes individuals committed involuntarily and those committed for "mental defectiveness or mental illness" but excludes individuals admitted for observation or a voluntary admission.[78] This exclusion bolsters our conclusion Congress's aim is to prevent individuals who are likely to harm themselves or others based on their mental illness from possessing a firearm.

### b.  *Barton*'s second hurdle.

Mr. Jefferies must now allege how his involuntary commitment is distinguished from the traditional justifications for excluding individuals from possessing firearms because their involuntary commitment makes them more likely to be a danger to themselves or others.  Mr. Jefferies fails as to make a meaningful distinction.

The state court involuntarily committed Mr. Jefferies because he was a danger to himself and others.  Mr. Jefferies's former wife asked the state court to involuntary commit him because he attempted suicide.[79]  Mr. Jefferies's involuntary commitment stems from an altercation with

13

his former wife where he used his car to "bump" his wife's car (with their child inside) and provoked an argument.[80] Mr. Jefferies attached his former wife's narrative to his complaint and does not allege his wife lied and does not deny his suicidal ideations and statements.

Mr. Jefferies's treating doctors extended his involuntary commitment under § 303 of the Mental Health Procedures Act. To extend treatment under § 303, Mr. Jefferies's examining physician and facility must apply and the state court must appoint counsel and hold an adversarial proceeding.[81] The court found Mr. Jefferies "severally mentally disabled" and extended his treatment for twenty days.[82] Mr. Jefferies's involuntary commitment for being a danger to himself fits directly into the historical justification of prohibiting individuals who are a danger to themselves or others from possessing firearms. His conduct falls outside the scope of Second Amendment protections.[83]

Mr. Jefferies offers no evidence distinguishing his commitment for attempting to harm himself from the class of individuals prohibiting from possessing a firearm because their involuntary commitment as a danger to themselves or others renders them more likely to harm themselves or others in the future. Mr. Jefferies attempts, instead, to distinguish his own post-commitment conduct from his conduct which led him be involuntarily committed. He argues the common law right to keep and bear arms did not "exclude from its scope (merely because of a recommitment) individuals like Mr. Jefferies, safe, sane, stable individuals who do not and have not presented a risk [to] themselves [or] others since the time of their commitment."[84]

Two courts in this District reviewing *Binderup* disagree with Mr. Jefferies and held evidence of individual's post-involuntary commitment mental health is not relevant to his challenge to § 922(g)(4). In *Beers v. Lynch*, Judge Davis recently dismissed an individual's identical as-applied challenge to § 922(g)(4) finding the individual's "'current fitness' to possess

14

firearms is of no moment" based on *Binderup*'s holding "the passage of time or evidence of rehabilitation" cannot restore an individual's forfeited Second Amendment right.[85] In *Simpson v. Sessions*, Judge Schmehl held § 922(g)(4) has no exception for the passage of time relying on *Binderup*.[86]

Mr. Jefferies's counsel, aware of our court of appeals directs we must not consider evidence of rehabilitation or post-deprivation conduct in as-applied challenges to federal prohibitions on firearm possession, argues we should follow the Court of Appeals of the Sixth Circuit where the case law is friendlier for him.[87] In *Tyler*, the court of appeals reversed the dismissal of an individual's allegation § 922(g)(4) unconstitutionally burdens his Second Amendment rights because he was involuntary committed twenty-eight years ago and had no intervening mental health issues.[88] The court based its conclusion on "persons who were once committed due to mental illness are forever ineligible to regain their Second Amendment rights."[89] The court relied on the individual's post-commitment conduct as the proper evidence to review whether § 922(g)(4)'s prohibition is unconstitutional as-applied to the individual.

To follow *Tyler* and examine Mr. Jefferies's post-commitment conduct we would have to ignore our court of appeals' rejection of the "claim that the passage of time or evidence of rehabilitation will restore the Second Amendment rights of people who committed serious crimes."[90] Our court of appeals is specifically discussing felons but its next sentence extends the reasoning to any federal prohibition, "[t]here is no historical support for the view that the passage of time or evidence of rehabilitation can restore Second Amendment rights that were forfeited" and any remedy afforded by Congress "is a matter of legislative grace…"[91] We decline Mr. Jefferies's request we ignore our court of appeals.

In a similar vein, Mr. Jefferies's reliance on *Keyes* is misplaced as it overlooks the

15

intervening governing decision in *Binderup*. In *Keyes*, the district court found § 922(g)(4) unconstitutional as-applied to a challenger because he is "no more dangerous than a typical law-abiding citizen" and "not a 'continuing threat' to himself."[92] The court relied on the language in *Barton* theorizing "a felon convicted of a minor, non-violent crime might show that he is no more dangerous than a typical law-abiding citizen. Similarly, a court might find that a felon whose crime of conviction is decades-old poses no continuing threat to society."[93] Our court of appeals overruled this argument in *Binderup* holding "[t]o the extent *Barton* holds that people convicted of serious crimes may regain their lost Second Amendment rights after not posing a threat to society for a period of time, it is overruled."[94] We find the portions of *Keyes* where the court relied on *Barton* and considered a challenger's post-commitment conduct unpersuasive after *Binderup*.

### ii. We need not reach *Marzzarella's* second step.

As Mr. Jefferies cannot overcome the two hurdles to challenging §922(g)(4) under *Barton*, we need not consider whether this prohibition can survive intermediate scrutiny.

### 3. Mr. Jefferies's inability to seek relief from §922(g)(4) does not render the prohibition unconstitutionally overbroad.

Mr. Jefferies argues § 922(g)(4) is unconstitutionally overbroad because there is "no reasonable procedure pursuant to which an individual could regain their Second Amendment rights upon demonstrating their current mental and emotional fitness."[95]

Mr. Jefferies's inability to secure relief from § 922(g)(4) to possess firearms again does not render the statute unconstitutional. Our court of appeals held "[t]here is no historical support for the view that the passage of time or evidence of rehabilitation can restore Second Amendment rights that were forfeited."[96] In *Binderup*, our court of appeals held as to § 922(g)(1), "to the extent Congress affords such a remedy in § 921(a)(20) or § 925(c), that is a

16

matter of legislative grace; the Second Amendment does not require that those who commit serious crimes be given an opportunity to regain their right to keep and bear arms in that fashion."[97]

At the same time, our court of appeals distinguishes § 922(g)(1) as not a complete evisceration because of the statute's "escape hatches" where individuals could regain their rights under § 921(a)(20) if the state expunges their convictions, the state pardons them, the state restores their civil rights, or through the currently unfunded ability for the Attorney General lift § 922 prohibitions.[98]

The Second Amendment does not protect Mr. Jefferies's right to seek relief from § 922(g)(4) because "[t]here is no historical support for the view that the passage of time or evidence of rehabilitation can restore Second Amendment rights that were forfeited."[99]

Even assuming our court of appeals' holding § 922(g)(1) is not *per se* unconstitutional is based on the "escape hatches" available to a felon challenger, Congress also provides two "escape hatches" from § 922(g)(4). The unfunded avenue to petition for relief from the Attorney General under § 925(c) is theoretically available to Mr. Jefferies just as it was to Messrs. Binderup and Suarez.[100] Congress's decision not to fund § 925(c) does not create jurisdiction for us to review a banned individual's § 925(c) petition. In *United States v. Bean*, Mr. Bean filed a petition for relief from § 922(g)(1) after Congress decided to disallow funding for § 925(c).[101] The ATF[102] returned Mr. Bean's petition unprocessed because Congress "forbade it from expending any funds to investigate or act" on his petition.[103] Mr. Bean appealed, arguing the ATF's failure to process his petition is really a denial and the statute provides judicial review in the district court for denials.[104] The Supreme Court rejected Mr. Bean's argument holding

"judicial review under § 925(c) cannot occur without a dispositive decision" and the ATF's failure to process an application is not dispositive.[105]

In 2008, Congress authorized another avenue to waiver: "a State court, board, commission, or other lawful authority shall grant relief ... [from §922(g)(4)] ...if the circumstances regarding the disabilities..., and the person's record and reputation, are such that the person will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest..."[106] If the state grants relief in accordance with this section, "the adjudication or commitment ... is deemed not have occurred for purposes of [§ 922(g)(4)]."[107]

Mr. Jefferies cannot presently obtain relief under this 2008 waiver because Pennsylvania has not implemented a relief program meeting Congress's requirements and because Congress withholds appropriations to fund § 925(c).[108] We lack authority, particularly absent a request, to compel either Congress to fund review under §925(c) or Pennsylvania to comply with federal requirements.

Our court of appeals did not find Messrs. Binderup and Suarez's inability to receive relief from Pennsylvania through § 921(a)(20) or from the United States through § 925(c) unconstitutional because a remedy to recover lost Second Amendment rights is "legislative grace," not a constitutional right.[109] As in *Binderup*, Mr. Jefferies's inability to secure relief through remedies of "legislative grace" through the two "escape hatches" does not make § 922(g)(4) unconstitutionally overbroad as-applied to him.[110]

## B. We dismiss Mr. Jefferies's Fifth Amendment claim.

Mr. Jefferies alleges the United States violates his Fifth Amendment right to due process in depriving him a right to keep and bear arms without pre-deprivation notice and an opportunity

to be heard or a post-deprivation proceeding for relief from the prohibition. The United States move to dismiss this claim and Mr. Jefferies offers no counter-argument in his brief.

To state a claim for procedural due process, Mr. Jefferies must have a constitutional right to process. In *Keyes*, the challenger alleged the United States deprived him of his Second Amendment rights without due process in prohibiting him from possessing a firearm because of his involuntary commitment without notice and an opportunity to be heard.[111] The court reviewed our court of appeals' decision in *Bell v. United States* affirming a district court's holding § 922(g)(1) does not require a hearing because "[t]he plain language of [the statute] makes clear Congress's decision to bar all convicted felons (not merely those with violent tendencies or who otherwise present an ongoing danger to society) from possessing firearms."[112]

The district court found the same rationale applies to a § 922(g)(4) prohibition because "the statute subsection is clear that anyone who has been committed for mental health is subject to it; thus a hearing on whether the plaintiff is still dangerous is not in fact relevant."[113] We agree. Congress enacted § 922(g)(4) to apply to all persons involuntarily committed. Mr. Jefferies does not challenge the propriety or accuracy of his involuntary commitment. Rather he asks for an exemption in spite of it. Mr. Jefferies does not have a Fifth Amendment right to procedural due process before the United States applies § 922(g)(4) to him because of his involuntary commitment.

The district court in *Keyes* also addressed the friction between *Barton* and *Bell* as *Barton* seemed to open the door for a felon to challenge a firearm ban based on his post-conviction conduct while *Bell* held a felon did not require due process before the firearm ban applies because the statute applies the ban to all felons. Our court of appeals' ruling in *Binderup* resolved this tension by overruling *Barton*'s opening for individuals to challenge the federal

19

firearm prohibition based on their post-deprivation conduct.

## C. We dismiss Mr. Jefferies's Fourteenth Amendment claim.

Mr. Jefferies alleges the United States' enforcement of § 922(g)(4) violates his equal protection and due process rights under the Fourteenth Amendment. Because Pennsylvania granted Mr. Jefferies relief from the state ban on firearm possession, any due process claim is now moot.

Mr. Jefferies alleges § 922(g)(4) is an "unconstitutionally broad ban" on the class of "individuals who have ever been involuntarily committed."[114] For equal protection, Mr. Jefferies must allege the United States treated him "differently from a *similarly* situated party *and* the [United States'] explanation for the differing treatment does *not* satisfy the relevant level of scrutiny."[115] Our court of appeals explained "[a]n essential element of a claim of selective treatment under the Equal Protection Clause is that the comparable parties were 'similarly situated.' Persons are similarly situated under the Equal Protection Clause when they are alike 'in all relevant aspects.'"[116]

Mr. Jefferies's allegation is unclear as to who the comparable parties are and how the United States treated them differently. Mr. Jefferies's equal protection allegations can be construed in two ways. If Mr. Jefferies is alleging he is treated differently than other individuals subject to § 922(g)(4) based on their involuntary commitment, his claim fails because he does not allege how the United States applied the ban on possessing firearms differently to him and other individuals who were involuntarily committed.

If Mr. Jefferies is alleging he and other "individuals who have ever been involuntarily committed" are together the class the United States treats differently, we cannot possibly discern the comparable party. We can only assume the comparable parties would be any individual

20

subject to ban on possessing firearms under federal law. Mr. Jefferies's equal protection claim still fails because Mr. Jefferies does not allege how "individuals who have ever been involuntarily committed" are treated differently than other individuals who have been banned from possessing firearms by the United States. Mr. Jefferies's claim also fails because he cannot show how a group of people encompassing every person subject to a federal law banning him or her from possessing firearms are similarly situated "in all relevant aspects."[117] Congress bans firearm possession for a myriad of reasons, and for equal protection purposes, we cannot say a person banned because he or she renounced his or her citizenship is similarly situated "in all relevant aspects" to an individual banned based on his or dishonorable discharge from the Armed Services.[118] While they are similar in both are banned from possessing firearms, the most important aspect, the operative conduct meriting their bans, is not similar.

Mr. Jefferies also references the closed off avenue for relief from §922(g)(4) provided by § 925(c), however, that avenue of relief applies to all firearm prohibitions and is, similarly, closed off to individuals banned under other sections so he cannot allege differing treatment based on §925(c).

We dismiss Mr. Jefferies's equal protection claim under the Fourteenth Amendment because he does not allege how the United States treated him differently from a similarly situated party.

**III. Conclusion**

We dismiss Mr. Jefferies's as-applied Second Amendment challenge because he fails to distinguish his involuntary commitment for being a danger to himself from the class of individuals Congress prohibited, the class being those involuntarily committed because they are a danger to themselves or others. Mr. Jefferies also fails to state a claim for a Fifth Amendment

violation because Mr. Jefferies is not constitutionally entitled to process before the United States subjects him to the prohibition under § 922(g)(4). Mr. Jefferies fails to allege an equal protection claim under the Fourteenth Amendment because he does not allege how the United States treated him differently from a similarly situated party.

---

[1] Complaint, ECF Doc. No. 1, ¶ 34.

[2] *Id.* ¶¶ 36-37.

[3] *Id.* ¶ 38.

[4] *Id.* ¶¶ 40-41.

[5] *Id.* ¶ 42.

[6] *Id.* ¶¶ 18-19.

[7] *Id.* ¶¶ 21-22.

[8] *Id.* ¶¶ 23.

[9] Exhibit A to Complaint, ECF Doc. No. 1 at 20.

[10] *Id.* The rest of her narrative is not filed in this Court.

[11] Exhibit B to Complaint, ECF Doc. No. 1 at 26-28.

[12] *Id.* at 28.

[13] Complaint, ECF Doc. No. 1, ¶¶ 26-28.

[14] *Id.* ¶ 35.

[15] *Id.* ¶ 29.

[16] *Id.* ¶ 30.

[17] *Id.* ¶ 31.

[18] *Id.* ¶ 31.

[19] *Id.* ¶ 32.

[20] *Id.* ¶ 33.

[21] In deciding a motion to dismiss under Rule 12(b)(6), we accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party, but we "are not compelled to accept unsupported conclusions and unwarranted inference, or a legal conclusion couched as a factual allegation." *Castleberry v. STI Group*, 863 F.3d 259, 263 (3d Cir. 2017) (quoting *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Edinboro Coll. Park Apartments v. Edinboro Univ. Found.*, 850 F.3d 567, 572 (3d Cir. 2017) (quoting *In re Vehicle Carrier Serv. Antitrust Litig.*, 846 F.3d 71, 79 n.4 (3d Cir. 2017)). A claim satisfies the plausibility standard when the facts alleged "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Maiden Creek Assoc., L.P. v. U.S. Dep't of Transp.*, 823 F.3d 184, 189 (3d Cir. 2016) (quoting *Ascroft v. Iqbal*, 556 U.S. 662, 678 (2009)). While the plausibility standard is not "akin to a 'probability requirement,'" there nevertheless must be more than a "sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Our Court of Appeals requires us to apply a three-step analysis under a 12(b)(6) motion: (1) "it must 'tak[e] note of the elements [the] plaintiff must plead to state a claim;'" (2) "it should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth;'" and, (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679).

[22] ECF Doc. No. 7 at 6.

[23] U.S. Const. amend. II.

[24] *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008).

[25] *Id.* at 628.

[26] *Id.* at 628 n.27.

[27] *Id.* at 626-27.

[28] *Id.* (citing *Heller*, 554 U.S. at 628).

[29] *United States v. Marzzarella*, 614 F.3d 85, 88 (3d Cir. 2010).

23

[30] *Id.* at 89.

[31] *Id.* (internal citations omitted).

[32] *Id.*

[33] *Id.* at 95.

[34] *Id.* (citing *Heller*, 554 U.S. at 628 n.27).

[35] *Id.* at 97.

[36] *Id.* at 99.

[37] *Id.*

[38] *United States v. Barton*, 633 F.3d 168, 169-70 (3d Cir. 2011).

[39] *Id.* at 174.

[40] *Id.*

[41] *Id.* (citing *Britt v. State*, 681 S.E. 2d 320, 323 (N.C. 2009)).

[42] *Binderup v. Attorney General United States of America*, 836 F.3d 336 (3d Cir. 2016), *cert. denied sub nom. Sessions v. Binderup*, 137 S. Ct. 2323 (2017), and *cert. denied sub nom. Binderup v. Sessions*, 137 S. Ct. 2323 (2017).

[43] *Id.* at 339 (quoting § 922(g)(1)).

[44] *Id.* (quoting 18 U.S.C. § 921(a)(20)(B)).

[45] *Id.* at 340.

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.* at 341 (quoting § 921(a)(20)(B)).

[51] *Id.* at 342.

[52] *Id.* at 344.

[53] *Id.* (citing *FEC v. Wis. Right to Life*, 551 U.S. 449, 464–65 (2007) (applying strict scrutiny to a statute prohibiting political speech at the core of the First Amendment); *United Pub. Workers of Am. v. Mitchell*, 330 U.S. 75, 102–03 (1947) (upholding the constitutionality of prohibitions on certain political activities by federal employees notwithstanding the First Amendment)).

[54] *See id.* (citing § 925(c)). This avenue of relief is not currently open because Congress ended funding for the Attorney General to review relief petitions.

[55] *Id.* at 346 (quoting *Marzzarella*, 614 F.3d at 97).

[56] *Id.*

[57] *Id.* at 347 (citing *Barton*, 633 F.3d at 173-74).

[58] *Id.* at 351-52.

[59] *Id.* at 356.

[60] *Id.* (emphasis added).

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] *Heller*, 554 U.S. at 626, 635.

[66] *Id.* at 627 n.26.

[67] *Binderup*, 836 F.3d at 343 (citing *Heller*, 554 U.S. at 631, 635).

[68] 18 U.S.C. § 922(g)(4).

[69] 27 C.F.R. § 478.11 (2014).

[70] *Id.*

[71] *See Binderup*, 836 F.3d at 343 (citing *Heller*, 554 U.S. at 631, 635).

[72] *See id.*; *see also Simpson v. Sessions*, No. 16-1334, 2017 WL 1910141 at \*4 (E.D. Pa. May 10, 2017) (finding 922(g)(4) is a presumptively lawful ban for people committed to a mental institute under *Heller*).

[73] *See e.g.*, *Tyler v. Hillsdale County Sheriff's* Department, 837 F.3d 678, 689 (6th Cir. 2016) (*en banc*) (finding a "lack of conclusive historical support for prohibiting the mentally ill from possessing firearms); *United States v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010) (finding an "absence of historical statutory prohibitions on firearm possession" before 1968); Clayton E. Cramer, *Mental Illness and the Second Amendment*, 46 CONN. L. REV. 1301, 1315 (2014) (finding a 1932 District of Columbia statute banned guns for the "not sound of mind" and a few states passed regulations in the 1950s-60s before the federal ban in 1968); Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 HASTINGS L.J. 1371, 1376 (2009) ("One searches in vain through eighteenth-century records to find any laws specifically excluding the mentally ill from firearms ownership. Such laws seem to have originated in the twentieth century").

[74] *Simpson*, 2017 WL 1910141 at \*5.

[75] *Keyes v. Lynch*, 195 F. Supp. 3d 702, 718 (M.D. Pa. 2016) (quoting Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 HASTINGS L.J. at 1377).

[76] *Id.* at 719-20; *accord Simpson*, 2017 WL 1910141 at \*5; *Yancey*, 621 F.3d at 683 ("Congress enacted the exclusions in § 922(g) to keep guns out of the hands of presumptively risky people").

[77] 27 C.F.R. § 478.11 (2014).

[78] *Id.*

[79] ECF Doc. No. 1 at 19.

[80] *Id.* at 20.

[81] 50 P.S. § 7303(b).

[82] ECF Doc. No. 1 at 27.

[83] *See Binderup*, 836 F.3d at 343 (measures prohibiting the mentally ill from possessing firearms "comport with the Second Amendment because they affect individuals or conduct unprotected by the right to keep and bear arms").

[84] Plaintiff's Response, ECF Doc. No. 7 at 7.

[85] *Beers v. Lynch*, No. 16-6440, Slip. Op. at 8 (E.D. Pa. Sept. 5, 2017).

[86] *Simpson*, 2017 WL 1910141 at *6.

[87] Mr. Jefferies' memorandum never distinguishes *Binderup* or *Marzzarella* but relies on the overruled holding in *Barton* suggesting post-deprivation conduct is relevant. Mr. Jefferies does rely on the district court's decision in *Binderup* and its joined case *Suarez v. Holder*, No. 14-968, 2015 WL 685889 (M.D. Pa. Feb. 18, 2015). During oral argument, Mr. Jefferies' counsel candidly admitted the obstacles to his argument posed by *Binderup* and instead focused on the inability to obtain relief from a §922 (g)(4) prohibition.

[88] *Tyler*, 867 F.3d at 699.

[89] *Id.* at 689.

[90] *Heller*, 554 U.S. at 349-50.

[91] *Id.* at 350.

[92] *Keyes*, 196 F. Supp. 3d at 722 (quoting *Barton*, 633 F.3d at 174).

[93] *Barton*, 633 F.3d at 174 (internal citation omitted).

[94] *Binderup*, 836 F.3d at 350.

[95] ECF Doc. No. 1, ¶ 3.

[96] *Binderup*, 836 F.3d at 350.

[97] *Id.*

[98] *Id.* at 345, 358 (Hardiman, J. concurring in part and concurring in the judgments).

[99] *Binderup*, 836 F.3d at 350.

[100] *See* § 921(a)(20).

[101] *United States v. Bean*, 537 U.S. 71, 73 (2002).

[102] The Attorney General delegated his authority to review § 925(c) petitions to the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). *See id.* at 74-75.

[103] *Id.* at 73.

[104] *See* § 925(c). "Any person whose application for relief from disabilities is denied by the Attorney General may file a petition with the United States district court for the district in which he resides for a judicial review of such denial."

[105] *Id.* at 77; *see also Pontarelli v. U.S. Dept. of the Treasury*, 285 F.3d 216, 226 (3d Cir. 2002) (holding the ATF's failure to process § 925(c) is not a denial to allow judicial review and Congress's appropriations ban does not "create new jurisdiction for district courts to evaluate felons' § 925(c) applications absent a 'denial.'"). Mr. Jefferies also cannot compel review of his § 925(c) petition through a writ of mandamus. In *McHugh v. Rubin*, the Court of Appeals for the Second Circuit held an individual cannot petition for a writ of mandamus compelling the United States to review his application because the United States has no statutory duty to act under § 925(c). "Here, the [United States] is under a statutory duty *not* to do the act in question." *McHugh v. Rubin*, 220 F.3d 53, 57 (2nd Cir. 2000). The court held "Congress could not have stated more clearly that the [United States] is prohibited from acting on applications submitted by individuals pursuant to § 925(c)." *Id.* at 58.

[106] 34 U.S.C. § 40915 (a)(2).

[107] *Id.*

[108] *See Keyes v. Lynch*, 195 F. Supp. 3d at 711 (Judge Jones held the Pennsylvania's relief program under 18 Pa.C.S.A. § 6105(f)(1) fails to satisfy the Congress's requirement for "an independent determination by a reviewing court that the grating of relief from a firearms disability would not be contrary to the public interest"); Mr. Jefferies agrees arguing "Pennsylvania has still not implemented a relief from disabilities program." ECF Doc. No. 7-1. at 16. Mr. Jefferies does not bring claims against Pennsylvania state officials in his complaint (and we are not sure under what legal theory he could require a state government to act).

[109] *See Binderup*, 836 F.3d at 340, 350.

[110] *See id.* at 350.

[111] *See Keyes*, 195 F. Supp. 3d at 723.

[112] *Id.* (citing *Bell v. United States*, 574 Fed.Appx. 59, 59 (3d Cir. 2014) and quoting *Bell v. United States*, No. 13-5533, 2013 WL 5763219 at *3 (E.D. Pa. Oct. 24, 2013)).

[113] *Id.*

[114] Complaint, ECF Doc. No. 1, ¶ 68.

[115] *Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.*, 867 F.3d 338, 348 (3d Cir. 2017) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439-40 (1985)).

[116] *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 273 (3d Cir. 2014) (quoting *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir.2008) and *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir.2005)).

[117] *Id.*

[118] *See* 18 U.S.C. § 922(g)(6)-(7).